351 F.Supp.2d 929 (2004)
Chad JOHNSON, et al., Plaintiffs,
v.
BOARD OF POLICE COMMISSIONERS: Jo Ann Freeman, et al., Defendants.
No. 4:04 CV 01266 ERW.
United States District Court, E.D. Missouri, Eastern Division.
October 14, 2004.
*930 Ann Lever, Legal Services Of Eastern Missouri, St. Louis, MO, was our lead attorney.

*931 OPINION

WEBBER, District Judge.
"It was the best of times, it was the worst of times." The contrasts of life as perceived by people in different stations of society are as vivid today as when Charles Dickens penned these words nearly one hundred fifty years ago. Order, we believe, is better than chaos  predictability is more comfortable than the unknown. In a society that prizes beauty, youth, vigor, and success that is measured by accumulation of precious things; the disheveled, the aged, the weary; those whose accumulated wealth is carried in a tattered blanket, present themselves in some quarters as a distraction to a desired representation of how the "best of times" should appear. They are extremely bright; they suffer from mental illnesses. They are capable of causing serious physical injury or death; their gentleness permits them to share their meager substance with birds that find a safe harbor at their feet. In making their claim to the American Dream, they participate in publically sponsored, government-supported celebrations from distant bridges, rather than penthouses, knowing that their rights that Thomas Jefferson proclaimed inviolate, being life, liberty and the pursuit of happiness, are no less guaranteed to them than to those not so vulnerable because they carry evidence of their station in life in their wallets rather than in a bag or worn blanket. The homeless present many diverse faces. Gaining a better understanding of the daily life issues they face is necessary to judge whether relief is indicated in this case, considering at the same time the requirements law enforcement officials face in performing their lawful duties. It is beyond the scope of this Opinion to address causes as to why individuals live on the streets, or solutions that would permit exercise of their independence in making their choices while presenting themselves as less of a perceived threat to some. The facts presented to the Court reveal much about the daily struggles of the homeless. It is important to gain an understanding of the issues to be resolved after the hearing at the Temporary Restraining Order stage of this proceeding wherein Plaintiffs seek both injunctive relief and monetary damages in a separate count. The Court considers the facts adduced at that hearing, realizing that motions for such temporary relief frequently do not permit the party against whom relief is sought to fully present its case. The conclusions herein stated relate only to Plaintiffs' requests for preliminary injunctive relief contained in Counts I(b), II(b), and III(b) of their Complaint.
The current matter is before the Court upon Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction [doc. # 2]. With regard to this Motion, the Court is also in receipt of Defendants' Post-Hearing Memorandum in Opposition to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction [doc. # 22] and Plaintiffs' Post-Hearing Reply Memorandum in Support of Motion for Temporary Restraining Order [doc. # 24]. Also before the Court is Plaintiffs' Motion to Supplement the Record with Additional Affidavits or in the Alternative for a Supplemental Hearing [doc. # 25] and Defendants' Memorandum in Opposition to Plaintiffs' Motion to Supplement [doc. # 27].
I. BACKGROUND FACTS
In recent years, many in the City of St. Louis have been actively engaged in efforts to revitalize the commercial and residential character of Downtown St. Louis. On October 30, 2003, several individuals, most of whom are homeless or use services *932 designed to meet the needs of homeless individuals, sent a letter through counsel to the mayor of the City of St. Louis, the city counselor, and the chief of police, informing them of mistreatment of the homeless by police in Downtown St. Louis. In subsequent meetings, Plaintiffs' counsel discussed the concerns outlined in this letter with various individuals, including representatives from the city counselor's office and the police department. Unsatisfied with the outcome of these discussions, on September 17, 2004, Chad Johnson, Kenneth Tate, John Brinkman, John Edwards, Harold Jackson, Ronnie Trawick, John Coleman, Loyde Henley, Joseph Kitchen, Glenn White, Everett Harris, Sandra Holbrook, and Stacy Smith ("Plaintiffs") filed this 42 U.S.C. § 1983 action, seeking injunctive and declaratory relief and damages against the St. Louis Board of Police Commissioners, Captain Mary J. Warnecke, and the City of St. Louis ("Defendants"). Plaintiffs also filed the instant Motion for Temporary Restraining Order and Preliminary Injunction. In their Complaint, Plaintiffs allege that Defendants have acted to "clean up" Downtown St. Louis by intimidating Plaintiffs and other homeless or homeless-appearing individuals and discouraging them from lawfully being in public areas, in violation of their constitutional rights.
On September 17 and September 20, 2004, the Court heard testimony on the Motion. During the hearing, the Court heard testimony from Chad Johnson, Sandra Holbrook, Everett Harris, Harold Jackson, Ronnie Trawic, Stacy Smith, Kenneth Tate, Timothy Swift, John Brinkman, Cynthia Wolken, Laura Campbell, Gene Stubblefield, and Mary J. Warnecke. On Plaintiffs' side of the case, those who present themselves as Plaintiffs' witnesses appear to be very bright, articulate and believable. They are at all times respectful of the Court, counsel and court personnel. Their testimony is helpful in this early stage proceeding which addresses whether preliminary injunctive relief is indicated. The Court notes that Defendants offer limited testimony at this early stage of the proceedings, generally denying that Plaintiffs can succeed on the merits of their claims, claiming that Plaintiffs have an adequate remedy at law, asserting that no police sweeps were authorized or executed, denying that officers arrest without probable cause, and denying that the homeless are targeted as alleged. Charges are pending against many of the Plaintiffs in municipal court for ordinance violations such as Begging and Drinking in Public. Yet to be resolved is whether, in arresting several homeless people, police action in these cases was based on probable cause.
II. JURISDICTIONAL BASIS
Federal Rule of Civil Procedure 65, which details the procedure for preliminary injunctive relief, does not confer jurisdiction. A request for injunctive relief must have an independent basis for federal court jurisdiction. See 13 Moore's Federal Practice § 65.05 (3d ed.2001). Under 28 U.S.C. § 1331, federal jurisdiction exists if the request for relief involves a question of federal constitutional or statutory law.
Plaintiffs' Complaint is brought pursuant to 42 U.S.C. § 1983. In the Motion, Plaintiffs assert that Defendants have committed and are continuing to commit violations of Plaintiffs' constitutional rights. Specifically, Plaintiffs allege that the St. Louis Metropolitan Police Department, in connection with the City, have a persistent custom of removing and discouraging homeless people from remaining in the Downtown area, causing Plaintiffs to suffer numerous constitutional violations. These include violations of (1) the Fourth Amendment right to be secure against unreasonable *933 seizures of persons and property; (2) the Right to Travel, as guaranteed by the Fourteenth Amendment's Substantive Due Process Clause; (3) the right to be free from punishment without due process of law, as guaranteed by the Fifth and Fourteenth Amendments; and (4) the Thirteenth Amendment's prohibition against involuntary servitude.
Preliminary injunctive relief is available to "redress alleged civil rights violations in actions brought under 42 U.S.C. § 1983 and in other civil rights actions." 13 Moore's Federal Practice § 65.22[4] (citing Gannon v. Action, 303 F.Supp. 1240, 1247 (E.D.Mo.1969), aff'd in part 450 F.2d 1227 (8th Cir.1971), and Central Presbyterian Church v. Black Liberation Front, 303 F.Supp. 894, 901 (E.D.Mo.1969)). Defendants, however, assert that the Younger doctrine mandates that this Court abstain from exercising jurisdiction over this action. According to Defendants, Plaintiffs are attempting to try their city ordinance violation cases in federal court, thus circumventing the city charges. Moreover, Defendants complain that Plaintiffs have an adequate remedy at law with regard to their arrests and that a complete legal remedy lies in the municipal court. In Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), the Supreme Court held that, ordinarily, principles of federalism require that a federal court abstain from enjoining an ongoing state criminal prosecution. However, this doctrine is subject to important qualifications. For instance, abstention is not proper when some circumstance in the case indicates that federal equitable relief is warranted due to a bad faith prosecution or harassment. See id. at 54, 91 S.Ct. 746. Further, abstention is required only when the state proceeding affords the federal plaintiffs the opportunity to raise their constitutional claims in state court, see Middlesex County Ethics Committee v. Garden State Bar Association, 457 U.S. 423, 435-36, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982), and it is not required if the plaintiff can demonstrate he will be irreparably harmed and that the threat to his federally-protected right is one incapable of being eliminated by a defense against the state criminal prosecution. Younger, 401 U.S. at 46, 91 S.Ct. 746.
Here, there are pending municipal ordinance violation proceedings; however, Plaintiffs are not asking the Court to enjoin those proceedings, nor do they ask the Court to invalidate any municipal ordinance at issue there. Plaintiffs argue that the state proceedings do not afford Plaintiffs an adequate opportunity to adjudicate their federal constitutional claims.[1] Plaintiffs do not make specific complaints about the ordinances themselves, but instead allege that their arrests were part of an overarching policy to discourage homeless people from being in the Downtown area. They further assert that they are not asking this Court to determine their guilt or innocence with regard to the ordinance violations and are not asking this Court to prevent the municipal court from doing so. Instead, according to Plaintiffs, this Court would only be considering such evidence to the extent necessary to ascertain whether there have been constitutional violations.
The Court agrees that, at this time and for several reasons, the Younger abstention doctrine does not prevent the Court from hearing this case. The evidence thus far indicates that Plaintiffs may have been *934 arrested for harassment purposes. Further, as will be discussed more fully below, Plaintiffs have made a sufficient showing of irreparable harm. Moreover, they have demonstrated that the threat to their federally-protected constitutional rights would not be eliminated by any defenses they might bring in the municipal court action. Thus, the Court will not abstain on the basis of Younger. Accordingly, the Court concludes that Plaintiffs' Motion raises cognizable constitutional claims and that the Younger doctrine does not prevent the Court from hearing these claims. Thus, federal subject matter jurisdiction exists to consider the Motion.
III. DISMISSAL OF DEFENDANT WARNECKE
As a preliminary matter, the Court notes that, in addition to the City of St. Louis and the St. Louis Board of Police Commissioners, Plaintiffs have sued Defendant Warnecke in both her official and individual capacities. She is sued in her official capacity for the purposes of implementing any injunctive relief ordered by the Court, and she is sued in her individual capacity on the basis of § 1983 supervisory liability. During the hearing on this Motion and in their Memorandum in Opposition to this Motion, Defendants argue that Defendant Warnecke should be dismissed from this action.[2] They alternatively argue that Plaintiffs have not made a sufficient showing that they can succeed on the merits with regard to their claims against Defendant Warnecke. After consideration and as explained more fully below, the Court has concluded that it is able to grant Plaintiffs sufficient relief by enjoining certain actions by Defendants St. Louis Board of Police Commissioners and City of St. Louis, without having to extend its order to enjoin any actions on the part of Defendant Warnecke in either her official or individual capacities. Therefore, the Court need not determine whether Plaintiffs are likely to succeed on the merits with regard to their claim against Defendant Warnecke and, at this time, it need not address Defendants' request that Defendant Warnecke be dismissed from this action.
IV. FACTUAL FINDINGS
The Court first notes that Plaintiffs submitted numerous affidavits in support of their Motion. Federal Rule of Civil Procedure 65 provides that, in issuing a temporary restraining order, a court may rely on "specific facts shown by affidavit." Fed.R.Civ.P. 65(b). In the instant case, however, the Court declines to rely on the affidavits provided by Plaintiffs.[3] Instead, the Court will rely solely on the testimony taken during its two-day hearing on this matter. Importantly, no findings or conclusions are made at this time regarding the claims for declaratory or compensatory relief, or for costs, including attorneys' fees, under Counts I, II, and III of Plaintiffs' Complaint. Temporary restraining *935 orders are frequently made on an ex parte basis. In this case, the Court heard substantial evidence from Plaintiffs and only limited evidence from Defendants. After hearing evidence from other named defendants and individual police officers, the conclusions reached in this Opinion may likely be substantially different. The factual findings are based only on the limited evidence proffered. Several homeless persons and others, regarded as homeless, related credible testimony concerning the issues they face in living on the streets of St. Louis. In determining whether they are entitled to relief, certain common questions need to be visited. Do homeless individuals have a right to be in public areas? Do police officers have authority to arrest homeless people in public areas and incarcerate them for the purpose of clearing them from public areas? Is it lawful for the City of St. Louis to punish individuals charged with crimes before their guilt or innocence has been determined by a jury or judge? Equal protection of the law guarantees certain rights not subject to question. A poor person has the same expectation of constitutional protection as a rich person. Police power is limited by the United States Constitution and the laws of the State of Missouri to prevent abuse of those least able to protect themselves.
The following testimony and related evidence shows, to the Court's satisfaction under the requisite standard of proof, that Plaintiffs are lawfully entitled to limited relief of a temporary restraining order to prevent the St. Louis Board of Police Commissioners from directing or allowing the clearing of homeless people from public areas solely to sanitize public places where the homeless have a right to be, because of the perception that homeless people present an appearance that detracts from an ascetically pleasing environment that promotes commerce. Furthermore, Plaintiffs are lawfully entitled to injunctive relief against the City of St. Louis to prevent any judicial imposition of punishment for any municipal ordinance violation before a determination of an accused person's guilt under an ordinance has been made.
Pursuant to Federal Rules of Civil Procedure 52(a) and 65(d), the Court makes the following findings of fact: Chad Johnson works as a custodian at the St. Louis Library where he has been employed for two and one-half months. He utilizes services provided at St. Patrick Center ("St.Patricks") and the Center for Catholic Charities. He completed a job training program designed to get homeless people back into the workplace as full-time employees. The course teaches computer training with various software programs including Microsoft Word, Excel, Access, PowerPoint and Publisher. He is a member of the alumni club for recovering addicts at St. Patricks. On July 3, 2004, Mr. Johnson was leaving St. Patricks where he had been attending a "Cocaine Anonymous" meeting, when he stopped to talk to a person named Ron in the neighborhood of the St. Louis Library. When he heard an explosion, he turned and saw some men throwing firecrackers from a vehicle and saw eight or nine people frenetically scattering. As these individuals were trying to escape, they seemed to be uncertain as to where they should go. He observed some individuals being handcuffed and put in a vehicle. Mr. Johnson looked at Ron who said, "[t]hey can't arrest us! We're not doing anything." A police officer who was driving the car pulled to the curb and said, "[w]e suggest you all leave." He then saw the passenger in the vehicle light a two inch by one-half inch firecracker and throw it over the hood of the car where it landed about one foot from Ron. Mr. Johnson was angry and very upset because the *936 police had acted in that manner. Mr. Johnson approached one of the officers in the van who had his window "rolled-up" and identified the officer that had thrown a firecracker at him. An officer got out of a van, grabbed Mr. Johnson by the arm, told him to turn around, put handcuffs on him and threw him inside the van with two other individuals whom he recognized. When Mr. Johnson asked the officer why he was being arrested, the officer told him to shut up. Mr. Johnson told the officer what he was doing was not right, and that he had no outstanding warrants. His only criminal record was a traffic ticket for failure to appear. The second time he inquired as to the reason for his arrest, an officer told him to shut up. Metal cuffs were tightly placed on Mr. Johnson.
When the van arrived at the Jefferson Street Police Station, Mr. Johnson saw a number of others being booked. He saw many of them crying and described a lot of commotion. When Mr. Johnson was charged with "Drinking While in Public," he told the booking officer that the charges were false, because he had not been drinking. He acknowledges a prior alcohol and drug dependency problem. After his request to take a breath test was denied, Mr. Johnson said, "[t]his don't make any sense, you know, I thought I was in America." At the station, he saw the officer who threw the firecracker at him, but Mr. Johnson remained quiescent. He refused to sign the prepared booking paperwork from the very officer who threw the firecracker at him because, if he signed it, he believed he would be lying to himself and to God.
From the police station, Mr. Johnson was transported in a van with ten other individuals, all of whom he recognized from shelters, to the Justice Center (the new facility on Tucker Street). The processing paperwork at the Justice Center took about ten minutes. He was placed in a cell where he was detained with about fifteen other inmates. Mr. Johnson was jailed from 12:00 a.m. until 10:00 p.m. on Sunday, July 4, 2004, when he was told by a man wearing a white shirt, blue pants and a badge that he would be released on condition that he first perform eight hours of community service under a court order from a City judge. Forty-four people had been arrested who were given the option of performing community service and being released from jail, or they could remain in jail until July 6, 2004, and appear before a judge. Because Mr. Johnson had just started a new job, he elected to perform the eight hours of community service rather than stay in jail and risk losing his employment. He and ten to fourteen other inmates were transported in a Community Service Van by "C.I.D. guys" in yellow shirts and black pants to Lucas Park where they were equipped with neon vests, gloves, trash bags and a tool designed to gather trash. He worked from 10:50 a.m. to 3:00 p.m. He was not paid for this work and he never appeared before a judge. He was asked to sign a paper to verify his attendance at the community service detail and to receive confirmation that no charges would be held against him. (Pl.Ex.No.32). Mr. Johnson believed that the charges lodged against him were "bogus." Mr. Johnson has been homeless for six years. He says that "you let the Lord guide you most of the time. You let God guide you. God is good." He confirmed that police have helped him in the past and that there are some good police officers. He does not know the six individually named defendants.
Sandra Holbrook has been living on the streets as a homeless person for two years. She testified that she was expecting to be placed in a house on the Thursday after the hearing. She uses the B.J.C. counseling, laundry and shower services. She *937 goes to St. Patricks for lunch and goes to the Christ Church Cathedral for bagels and coffee. She also gets food from the Mobile Food Outreach Van. Ms. Holbrook is a licensed vendor who purchases What's Up magazines for twenty-five cents and re-sells them for a profit. These magazines are distributed by and for homeless people and disadvantaged individuals. Her best business day is Friday, a "payday," when she can expect to sell as many as nineteen magazines. She usually sells about twenty-five magazines weekly earning about $100.00. When the police arrested her on July 3rd, she lost twenty magazines. She believes that she and the others arrested on that day were hassled and that bogus charges were made against them.
On July 3, 2004, Ms. Holbrook was on the Locust Street side of the public library waiting for the mobile outreach food truck. In the winter, the van supplies food, water and blankets, and throughout the year it brings food to the homeless. From the Breakfast Club at the Church of Christ Cathedral, she recognized two or three of the seven or eight people who were also waiting for the food van. She saw two or three SUVs that "pulled up real quick." One of the plain clothes' officers had a badge. They asked to see the identification documents of those assembled for the purpose of determining if any had outstanding warrants. She heard firecrackers. She saw a policeman throw a firecracker at "one man" who "was sleeping like right across on this side because there's the door of the library he was on the other ledge." She displayed her identification because she knew she had no warrants. An officer put plastic handcuffs on her. Officers put "real cuffs" on others and plastic cuffs on some because they said they could not check all of the identification records at that time. The officers said they would release those arrested if there were no outstanding warrants. One of the officers said that "the rich people just doesn't want-don't want [you] Downtown." The officers put her in an SUV by herself. She heard other firecrackers. They then "put an elderly thin black beside me." Officers were throwing firecrackers towards three people; one of the officers throwing firecrackers was in the SUV with her. She recognized Mr. Johnson as the man sitting on her right side in the van on July 3rd. She saw him outside the van before the police put him in the van. She said he had no beer when he was arrested. She smelled no alcohol on him. She was taken to the police station, then to the Justice Center where she and all assembled there were told that all would be doing community service. The names of twelve to fifteen homeless individuals were called. The remainder were told that they could leave. Those doing community service were fitted with yellow jackets and were told that they would be taken to parks. Before she was released at 11:40 a.m. on July 4th, she received some "paperwork" which she lost. She received a pink copy of Plaintiffs' Exhibit Number 16. She believes that she must appear in court on October 11, 2004, to answer a charge of Begging. Miranda rights were not extended to her when she was arrested.
On August 5, 2004, when the Straussenfest was being celebrated Downtown, she and four or five other homeless people were on blankets with their bags in the park in front of the public library on Olive Street. An officer on a horse said "that with the Straussenfest going on and any of the other activities Downtown, it doesn't really look prospective for the people to see homeless residing in the park." The officer, she said, told them that they should move out of the park. She and the others did not move from the park.
*938 Ms. Holbrook is an addict, claiming to be "clean" for one year. Her criminal record lists being in a private alley in 1984, and her arrest on July 3, 2004, for Begging. She has no drug arrests. She does not know Mary Warnecke, Jo Ann Freeman, Susan Robbins, Barthalomew Saracino, Michael Quinn or Francis Slay. She has no complaint against any of them individually. None of them personally harassed her. She believes that on July 3rd and 4th the police "harassed us. I mean that was bogus charges for what they arrested us for."
Everett Harris, 55, a Viet Nam Veteran and former corrections' officer, has been living on the streets of St. Louis as a homeless person for three years. He works for a non-profit organization in Washington D.C. called V.I.P. (Vote is Power). He works thirty-eight hours weekly registering voters. He receives services from New Life Evangelical Center, St. Patricks and the homeless care van which delivers food and clothing. With no vehicle, he relies on the bus for transportation.
On July 3, 2004, between 3:00 p.m. and 5:00 p.m., Mr. Harris was on the shady, south side of the public library waiting for the arrival of the food van where it usually comes through. Other young men were congregating nearby. Between five to eight officers approached from Thirteenth Street in three vehicles. One vehicle "curbed." The officers were wearing plain clothes and were driving unmarked cars. One was an SUV. Some had badges around their necks. They asked to see identification information to determine if any persons there had outstanding warrants. He heard loud noises from fireworks on the sidewalk at the entrance to the back of the library. While the fireworks "came from the vicinity of the police," he could not identify who ignited the fireworks. One police vehicle drove away after the identification information was collected and another vehicle with a uniformed officer arrived. He talked to the other officers about fifteen minutes before he drove away. Mr. Harris, along with seven or eight other homeless individuals, was arrested and placed in a Paddy Wagon without being advised of the charges. He was acquainted with some of those arrested with him. They were taken to the Jefferson Street police station and placed in a room. His belongings were searched and placed in a plastic bag. The police there told him nothing. He was taken to the Justice Center about midnight where he was incarcerated until about 11:40 a.m. on July 4th. A man in a white shirt with a badge and Lieutenant bars wearing dark pants told them that they would be released, but if the noise did not stop they would all be put back in jail. An announcement was made that fifteen people among them would be called to do community service. His name was not called. There were people there called C.I.D. officers in lime green vests. He was charged, before his release, with Drinking in Public and given a court appearance date of October 11, 2004. He claims that he was not drinking alcohol at the time. He believes the police acted improperly in making the charges against him and others. Mr. Harris has a criminal record for failure to purchase a ticket on Metro-Link, and about twenty-five years ago, he had an arrest on a drug charge. He believes that police officers protect him. He has contact with police officers when registering voters and gets compliments from them. He does not know Mary Warnecke, Jo Ann Freeman, Susan Robbins, Barthalomew Saracino, Michael Quinn or Francis Slay.
Harold Jackson is a homeless person living on the streets who receives services from St. Patricks and the Catholic Church Charities. St. Patricks provides a bus *939 pass for him to get to work as a cook at the Water Color Cafe. Mr. Johnson was behind the public library with a man named Terry on July 3, 2004. He had prepared lunches at the St. Patrick's Center and noticed it had stopped raining when they were getting ready to eat. At that time one white and one burgundy van pulled-up. A real thin officer exited the passenger side of the van. He was hollering, telling them which direction to go. Another officer pulled a badge from his shirt and said, "I'm the police." Mr. Jackson's attention was redirected when he heard firecrackers. The noise came from the direction of an officer who exited from the left side of a car. He did not see the officer light the firecracker. An officer told him where to go and asked him for identification. The officer told him that people without a warrant would not go to jail. About ten other homeless people were there that Mr. Jackson recognized from shelters. A Lieutenant appeared in a marked vehicle. One of the homeless individuals had a confirmed warrant. All of the homeless people were arrested and taken to the Jefferson Street police station where they were joined by many others. Mr. Jackson refused to talk to the officers. He was kept at the police station until midnight when he was transferred to the "jail on Tucker" where he was booked, searched and placed in a holding-cell. He was not enlightened as to why he was being held. At 8:30 a.m. on July 4th he was given a summons to appear (Pl.Ex.No.34) in court on October 11, 2004, at 4:00 p.m., and was then released. He was charged with Begging. When he was arrested, he was eating.
Upon his release from custody, Mr. Jackson returned to St. Patricks for food. He called his girlfriend. Before his arrest, they had planned to attend the festivities in Downtown St. Louis on July the Fourth. At about 3:00 or 3:30 p.m., he went back to Lucas Park and began eating hot wings with Stacy Smith. At Thirteenth and Locust Streets, right after they started eating, he heard some firecrackers. Mr. Jackson says that he did not see an officer light a firecracker. However, he saw an officer throw one five feet from him. As many as ten or eleven firecrackers were thrown. Some officers approached them. One officer said, "I took you to jail yesterday, and guess what, you're going today." Mr. Jackson and about nine others were directed to go to the top of the hill where he and the others were arrested. They were transported to the Jefferson Street Police Station. An officer there said, "[t]hat's Jackson. He's not going to talk to us. Look him up. Find someplace to put him." When a black officer tried to put some property with Mr. Jackson's property, Mr. Jackson was pushed two times in the neck. When Mr. Jackson asked not to be pushed, after being pushed the second time, he slammed the officer into an observation window and spit in his face. Mr. Jackson says he was "roughed-up" and stripped naked. He does not know where his clothes were taken. He was placed in a cell with an observation camera. Eight officers came back and cuffed and shackled him. A black female officer transported him, unclothed, to the Tucker Justice Center. His request for clothing was denied. When the shift changed six or seven hours later at the Justice Center, he was given clothing. On July 4th, Mr. Jackson recognized Stacy Smith and some of the other individuals arrested on July 3rd who were still at the Justice Center. At about 11:00 to 11:45 p.m., he was released and advised that he had been arrested for Begging, the same charge for which he had earlier been charged. A document shows that on July 4, 2004, he was charged with Drinking (Pl.Ex.No.9). He denies drinking. Mr. *940 Jackson says he has had no alcohol to drink since 1992. None of his property was returned except a broken identification card. Property that was lost included a silver chain with initials "D" and a silver ring that belonged to a girlfriend. He felt like he had been kidnapped and believed he had not been treated fairly. He confessed to being convicted for Second Degree Murder in 1978, for Forgery in Green County, for Third Degree Assault, for Malicious Mischief, for Larceny, Burglary more than once, for Robbery with a Deadly Weapon and for Aggravated Assault.
Formerly from Memphis, Tennessee, Mr. Jackson has been in St. Louis since June. He is employed at the St. Patrick Center in building maintenance. He claims no drug or alcohol problem. He states that he has never begged nor asked people for donations. He admits to a violence problem. He believes that the police are out to get him, that all police are no good at all and that they are no better than anyone else. He is acquainted with Mayor Slay, but agrees that the Mayor is not out to get him.
Ronnie Trawic, a homeless person, stays at Sunshine Ministries. He attends a men's ministries program and a substance abuse course which he expects to complete in thirteen months. Additionally, he uses the Breakfast Club at the Christ Church Cathedral. He attends another substance abuse program at St. Patricks and receives medical care at the Grace Hill Medical Clinic. He currently has no source of income. His most recent employment was at the Pasta House Restaurant in the Chesterfield Mall. He has no personal transportation.
On July 3, 2004, Mr. Trawic was sitting at the Sixth Street walkway at Kiener Plaza talking to John Coleman when a Chevrolet Lumina and an older model white van appeared. A male and female, both attired in plain-clothes, exited the Lumina. Four male officers, wearing shirts, wide belts with guns, badges and radios, got out of the van. They "trotted up to us" and said they were looking for individuals "resembling us" as violators who rode the Metro without paying. Mr. Coleman provided identification. Mr. Trawic had none. After "running their names for warrants" and discovering none, they were asked if they were going to the Fair. Mr. Trawic told them that he had a ticket in St. Louis County for riding the Metro without paying, then responded that they were going to the Fair. The officer said, "[h]ave a nice time." A few minutes later two of the same officers returned and placed plastic handcuffs on both Mr. Trawic and Mr. Coleman.
In response to an inquiry by Mr. Trawick as to the nature of the charges supporting the arrest, an officer said, "[w]e'll think of something." Miranda warnings were not offered. The male and female officers from the Lumina put them in the Paddy Wagon and they were transported to the Jefferson Street-Martin Luther King police station. Both sides of the van were crowded with other homeless people. All were African-American men. Mr. Trawic recognized some of the people from the Church of Christ Breakfast Club and St. Patricks. He was told at the police station that he was being booked for Drinking in Public. He said that he had not been drinking and was not drinking a beverage of any kind. At the time of his arrest, there were hundreds of people "out and about" on Market Street. Some were going to the ball game and some were drinking alcoholic beverages. Some were going east towards the Fair. He saw some carrying Busch Beer that were not arrested.
Mr. Trawic remained in a holding cell for about forty-five minutes and then was *941 transported to the Justice Center where he was booked and put in a cell where he remained until the next morning. With thirty-five to fifty others, some of whom he remembered from the ride in the Paddy Wagon and others from shelters, he was put in a holding area where a corrections' officer told them that originally, they were not supposed to be released until Tuesday, but they had been given an option of doing eight hours of community service or remaining in jail. Mr. Trawic chose the community service option, but his name was not called so he did not do community service.
Mr. Trawick admits to numerous criminal convictions including Stealing a Motor Vehicle "several times," Burglary, drug violations, Trespassing, First Degree (1982), Robbery First Degree (1985), and Armed Criminal Action. He was released from prison in 2002, after a twelve-year term. He does not know Mary Warnecke, Jo Ann Freeman, Susan Robbins, Barthalomew Saracino, Michael Quinn or Francis Slay. He has no information that any of them are out to get him.
Stacy Smith is not a homeless person. He was recently hired a McMurphy's Bar and Grill. He stays in St. Peters, Missouri. On July 4, 2004, his girlfriend drove him to Downtown St. Louis about 8:30 a.m. where he utilizes the services of St. Patricks and the Shamrock Center. At 5:00 p.m. or 5:30 p.m., he had purchased some chicken wings at Maurizio's Pizza. He and Harold Jackson were sitting on a bench eating when he heard some fireworks. Mr. Jackson volunteered, "[T]hose police officers will lock us up." Mr. Smith was not worried because he had done nothing wrong. When he heard the sound of firecrackers, he turned around and about thirty feet away saw firecrackers being thrown from a van or SUV. He turned around and continued to eat when he saw undercover police approaching wearing their badges around their necks and "guns on their waist." Mr. Smith and Mr. Jackson were invited to join the police and a couple of other guys on the top of the hill. Five of six others were already there. He was told to enjoy the fireworks because those would be all he would be seeing. He recognized some of those assembled from locations of his resource providers. As a former homeless person, Mr. Smith carried what he needed in a bag including his glasses, deodorant, extra face towels and a Walkman radio. One of the officers told him he would not need the bag. As he approached the top of the hill, Mr. Smith continued to eat. An officer told him to "hurry up and finish eating because [you are] going to jail." At the top of the hill all were arrested, white plastic ties were applied and they were placed in a Paddy Wagon. When Mr. Smith first asked an officer if he could take his bag, the officer said he would get his bag. The second time when Mr. Smith asked if he could take his bag, the officer said "fuck [your] bag. It will be there when [you] return."
Mr. Smith was taken to the Jefferson Street-Martin Luther King police station in one of two vans at about 5:15 p.m. Mr. Smith saw others he recognized including Mr. Harold Jackson. Mr. Smith was upset because he had not been permitted to bring his property. He was placed in a holding cell until about 8:30 p.m. when he was removed to the Criminal Justice Center. At the Justice Center, Mr. Smith observed that Harold Jackson was handcuffed behind his back without clothes. "He was naked." At the Justice Center, Mr. Smith was placed in a cell with eighteen to twenty others who slept the best way they could. At 6:00 or 6:30 a.m. on July 5th, he was released without receiving a summons. He was told that he would be charged with Drinking in Public. Mr. Smith testified he had nothing to drink for *942 seven or eight months. He said that Mr. Jackson also had not been drinking. His property, including his eyeglasses and radio, was left in the park and was lost. He felt like a common criminal. He felt badly for his girlfriend because she came Downtown to join him for the Fair and he was in jail. She wanted to know why he was locked-up, and no one could tell her why that had occurred. There is no evidence that Mr. Smith has any criminal record. Mr. Smith believes that the City is out to get the homeless. Because of their actions and their sweeps, Mr. Smith believes that the police regard the homeless as no good. Mr. Smith stays away from Downtown when the "sweeps" are going to occur. Homeless people, he says, know when the sweeps are occurring. He does not know Mary Warnecke, Jo Ann Freeman, Susan Robbins, Barthalomew Saracino, Michael Quinn or Francis Slay. He does not believe that they are individually out to get him.
Kenneth Tate, 54, lives at 2228 Olive Street in a traditional hotel for single men. He has lived alone for five years. He has an automobile that is not always operational. Homeless services he uses include the Larry Rice facility, St. Patricks, Christ Church Cathedral and other churches. He earns money as a street musician playing all over Downtown as a Busker, where his permit allows. He receives Social Security Disability, because of Post-Traumatic Stress Disorder initiated when he observed a friend killed. His diagnosis is Post-Traumatic Stress Disorder, Agoraphobia (fear of people in open spaces and crowded places) and clinical depression. He takes Zoloft regularly. Mr. Tate claims to have suffered from Agoraphobia and from depression and Post-Traumatic Stress Disorder since 1965. He was a Marine on active duty in Viet Nam.
On June 27, 2004, at about 10:00 a.m., Mr. Tate was playing his trombone at normal volume about forty to fifty feet in front of the Market Street Post Office. A Federal female security guard from the post office approached him She told him to pick-up his case, his money and leave. When he displayed his permit, she said, "[I] don't care about [your] fucking Busker's permit." In rebuttal, Mr. Tate said, "I don't care about you either, bitch." There is nothing in the record to show that Mr. Smith was non-compliant with his valid permit. He recognizes that his permit does not allow him to play at Busch Stadium, Union Station and some other venues not here applicable. Shortly after the verbal exchange, "the police drove-up." Officer Browning, a short Caucasian male, "threw me on the car, handcuffed me very tightly, and punched me near my kidneys." Then, four or five other officers arrived. Mr. Tate displayed his permit to them. The officers conferred away from him, and the Sergeant confirmed that Mr. Tate was legal. Officer Browning said that Mr. Tate should be removed from the area, and said Mr. Tate would be arrested for peace disturbance. Officer Jackson said that he was going to put his foot up Mr. Tate's ass. Mr. Tate responded that he was a Viet Nam Marine, and if Officer Jackson did not kill him, Officer Jackson would never walk the streets again, because he would bleed, too. All of Mr. Tate's documents were taken from his wallet including his Medicaid and Medicare cards. He had to have his documents replaced and was without medical and dental protection for three days. He had another pair of eyeglasses to replace those lost during the period of incarceration.
The officers took Mr. Tate about five miles north of Downtown along the river front at First Street and Mullanphy where they threw his horns in the weeds and told him to have a good day. Mr. Tate feared for his life. On the trip, he prayed that God would take care of him. The Paddy *943 Wagon was followed by two or three patrol cars. When the police left, Mr. Tate retrieved one of his horns, and while still on the river bank, played When the Saints Go Marching In. He then walked back Downtown to Lucas Park carrying his Indiana Saxophone, Blessing Trombone, a portfolio that weighed about forty pounds, a horn stand and some Chuck Berry VOODOO sticks. When he arrived at the park he played music, and about 3:00 p.m. or 3:30 p.m. he saw the police rounding-up at least fifteen more homeless people, some of whom he knew from his experiences at the shelters. The police told them to get out of the Park onto the sidewalk. He saw no one arrested on that occasion. He was told by a policeman that his Busker Permit was damaged by rain, that he needed to get a new one and have it laminated, and that he could not play until he acquired a new permit. (Pl.Ex.No.35). He was compliant, got a new permit and went back to play. (Pl.Ex.No.31). Mr. Tate went to the Internal Affairs Division (IAD) of the police department to complain of his treatment, but got the "runaround." Mr. Tate has one criminal conviction which was Unlawful Use of a Weapon in 1999.
Timothy Swift has been homeless for about two and one-half years. He sleeps in abandoned cars in Opal's junkyard at Broadway and Hickory in the Soulard area. He relies on St. Patricks and the Jerry Rice facility in the winter. On July 4, 2004, Mr. Swift was sitting in a chair at Broadway and Hickory under a bridge watching the Fair's air show. Other people were across the street with chairs and coolers. They were not homeless because they had children and automobiles. Before the three police officers appeared, Mr. Swift had nothing to drink but water. When the officers first arrived in a van, Mr. Swift thought their automobile was a church van with food. He and others approached the van, then, from their badges and guns, realized the occupants were policemen, and retreated. Mr. Swift and others went back under the bridge to watch the air show after the officers told them to leave. The police then approached them and told them that they meant for them to leave, and leave the area. One officer was bald, about six feet one-inch in height and weighed about two hundred five pounds. The officer that approached Mr. Swift was blond-headed, about six feet one inches tall and weighed about one hundred seventy-five pounds. The officer that approached Mr. Swift started to pull his firearm. Mr. Swift dropped his chair and jacket. The officer told Mr. Swift he was under arrest. Mr. Swift asked, "[f]or what?" The officer responded, "I'm the police, I've got a badge and a gun and I can do what the fuck I want." The officer said "he could get [him] for drinking in public or pissing in public." All of the people with Mr. Swift were arrested, placed in plastic cuffs, put in a van and taken to Kiener Plaza where the police picked-up another "guy" who was placed in an already crowded van. He saw a white couple with a six pack of Budweiser in addition to the beers they were drinking. Several in the van asked why they were not also arrested. Mr. Swift said the police just laughed.
When Mr. Swift was arrested, the police dropped his personal belongings on the ground and told him he did not need them. Inside the van, Mr. Swift kept hearing fireworks and heard the police laughing. They drove around the Downtown area looking for people to lock-up. At the 7-Eleven store they picked-up a white homeless guy and a black homeless guy and he heard one of the officers say, "we might get our quota." One of the officers said, "we are doing a sweep so people can enjoy their holiday." Mr. Swift was taken to the Jefferson Street-Martin Luther King *944 Street Police station. In all, he was held for from twenty to twenty-four hours. After Mr. Swift's release, he said an officer came to the bridge, put a gun to his head and said he was going to kill him.
Mr. Swift has been convicted of Carrying a Concealed Weapon, Assault (in high school) and a drug charge years ago. He claims to know Mayor Slay, one of the defendants in this case, from his term of employment with the City. He does not know Mary Warnecke, Jo Ann Freeman, Susan Robbins, Barthalomew Saracino or Michael Quinn. He has no reason, at this stage of the proceedings, to suspect that any of the individually named defendants are individually depriving him of constitutional rights.
John Brinkman has been homeless since February 2, 2004. He lives at Rizzotti's Center on Grand Boulevard which is a nursing and "in between" housing facility. He relies upon St. Patricks and the B.J.C. Grace Hill Behavioral Health Center for services.
On July 3, 2004, he was on his way to a barbecue. It was raining. He went to the 7-Eleven store on north Seventeenth Street to wait for the bus and get change for the bus fare. He had two bags. He and two homeless friends were under the awning, seeking protection from the rain. A large van pulled-up and three men got out and approached them. Mr. Brinkman grabbed his bags and headed around the corner of the 7-Eleven store. As he was walking away, one of the officers grabbed him from behind, spun him around, struck him in the chest knocking the wind out of him, took him to the ground and dragged him in front of the 7-Eleven store and cuffed him with plastic straps. One of the officers was a large man with a goatee. In the process, his portable radio was smashed when he was struck in the chest. Upon his request, Mr. Brinkman was advised of the Caucasian officer's badge number. Mr. Brinkman and his two friends were also arrested, and all were placed in the van and taken to the Justice Center where they were jailed for the night. He was not told of the charges nor were Miranda warnings given. His cell was very crowded. The next morning, he along with many other people were taken to a large room where he sat against the wall for a long time. Finally, a corrections' officer said if they did community service they would be released. He was not required to perform community service. He and his two friends went back to the precinct office to claim their belongings. When he was released, he received a summons for Drinking in Public. (Pl.Ex.No.8). He claims that he had not been drinking at all and was not drinking in public. He had an unopened bottle of rum, which he intended to take to the barbecue, in his bag when it was taken from him, but when his bag was returned, the rum was missing. The man who released his bag told him to stay away from the Downtown area, because if the officer saw him again, he would be arrested again. Mr. Brinkman was frightened and went to a grocery store to hide. At the time, he was employed at McMurphy's Grill, a place of employment that offers a transition back to society. He could not handle the stress of the job. He takes Zoloft for Post-Traumatic Stress Disorder because of a bad childhood. He had Bronchitis when he was young, worked with asbestos and contracted tuberculosis. Mr. Brinkman's arrest was stressful. He believes the police profile the homeless and that they have something against him. He believes the police are an imminent threat to him. He does not know Mary Warnecke, Jo Ann Freeman, Susan Robbins, Barthalomew Saracino, Michael Quinn or Francis Slay.
*945 V. ANALYSIS OF REQUEST FOR INJUNCTIVE RELIEF
Preliminary injunctive relief functions to "preserve the status quo until, upon final hearing, a court may grant full, effective relief." Kansas City Southern Trans. Co., Inc. v. Teamsters Local Union # 41, 126 F.3d 1059 (8th Cir.1997) (citations omitted). "A district court has broad discretion when ruling on requests for preliminary injunctions and [the Court of Appeals] will reverse only for clearly erroneous factual determinations, an error of law, or abuse of discretion." Manion v. Nagin, 255 F.3d 535, 538 (8th Cir.2001) (citing Entergy, Arkansas, Inc. v. Nebraska, 210 F.3d 887, 898 (8th Cir.2000)). Injunctive relief is only appropriate where the party seeking the relief has no adequate remedy at law. The relevant factors to be considered by a district court are: "(1)the probability of success on the merits; (2) the threat of irreparable harm to the movant; (3) the balance between this harm and the injury that granting the injunction will inflict on the other interested parties; and (4) whether the issuance of an injunction is in the public interest." Entergy, 210 F.3d at 898 (citing Dataphase Sys., Inc. v. C.L. Sys. Inc., 640 F.2d 109, 114 (8th Cir.1981) (en banc)); see also Medicine Shoppe Int'l, Inc. v. SBS Pill Dr., Inc., 336 F.3d 801, 803 (8th Cir.2003).
The "[f]actors are not a rigid formula .... `The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies.'" Branstad v. Glickman, 118 F.Supp.2d 925, 938 (N.D.Iowa 2000) (citing Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 506-07, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959)). No one factor is dispositive of the request for an injunction; the Court considers all of the factors and decides whether "on balance, they weigh in towards granting the injunction." Dataphase, 640 F.2d at 113; see also Branstad, 118 F.Supp.2d at 938 (citing Baker Elec. Co-op, Inc. v. Chaske, 28 F.3d 1466, 1472 (8th Cir.1994)). The burden of establishing that preliminary relief is warranted is on the party seeking the injunction. Id.
A. Irreparable Harm
The Court first considers whether irreparable harm will occur if the Court does not grant the preliminary injunctive relief requested by Plaintiffs.[4] To be irreparable, the harm anticipated to occur while awaiting a full trial on the merits must not be capable of redress by equitable or legal relief, thereby warranting preliminary relief to maintain the status quo. Irreparable harm is shown where the movant has no adequate remedy at law. Branstad, 118 F.Supp.2d at 942 (citing Baker Elec., 28 F.3d at 1473). Intangible injuries, which are not "easily valued or compensated," may support the need for preliminary relief. Id. (citing Glenwood Bridge, Inc. v. City of Minneapolis, 940 F.2d 367 (8th Cir.1991)). In addition, the party seeking the injunctive relief must show a significant risk of harm exists. The "mere possibility" that harm may occur before a trial on the merits is not enough. See, e.g., Coteau Prop. Co. v. Dept. of Interior, 53 F.3d 1466, 1481 (8th Cir.1995) (finding "no credible showing of irreparable harm" where the plaintiff only *946 demonstrated an "uncertain and contingent possibility of reparable harm at some point in the nebulous future"). The showing of past harm is also insufficient. See Packard Elevator v. I.C.C., 782 F.2d 112, 115 (stating that the movant must show that harm has occurred in the past and will most likely reoccur in the future). See also Bandag, Inc. v. Jack's Tire & Oil, Inc., 190 F.3d 924 (8th Cir.1999) (denying injunctive relief for failure to demonstrate irreparable injury).
It is clear to the Court that Plaintiffs have suffered harm and are likely to continue to suffer harm without judicial intervention at this stage of the proceedings. Among other things, Plaintiffs appear to have been subjected to arrests made in the absence of probable cause, inaccurate or fabricated charges, and intimidation tactics such as the throwing of firecrackers by police officers. They appear to have been subjected to forced labor in the form of community service work before being found guilty of any crime and to have had their property unlawfully taken. At least one was taken from Downtown and abandoned along the river front. Further, Plaintiffs have demonstrated that these harms do not appear to be isolated incidents of constitutional deprivations. Instead, they appear to be part of a larger effort to target homeless and homeless-appearing individuals to remove them from public areas. The evidence demonstrates that these violations have been occurring for at least a year and have persisted despite notice to city and police officials. (Pl.Ex.Nos.1, 2).
The Court believes that the harms discussed herein are not capable of being redressed by legal relief.[5] While the past constitutional violations of which Plaintiffs complain may well be able to be redressed through the underlying § 1983 action, so long as the practice of targeting homeless and homeless-appearing people to remove them from the Downtown area continues, Plaintiffs are likely to suffer repeated violations of their constitutional rights. Such repeated violations may well discourage Plaintiffs from seeking the services they need located in the Downtown area, causing them to miss food, medicine, counseling, treatment, and work opportunities. The resulting intimidating environment is likely to deter individuals from seeking out the services required for daily living. In addition, the Court finds that the threat of future harm is real and imminent. The evidence currently before the Court indicates that these constitutional violations are not one-time occurrences, but appear instead to be part of an ongoing practice. If such practice is allowed to continue, Plaintiffs are likely to suffer future harm, and such harm is imminent. For these reasons, the Court concludes that a significant risk of harm exists, and without judicial intervention at this stage in the proceedings, additional harm is imminent. Thus, the Court concludes that a threat of irreparable harm, not compensable by legal or equitable relief after a trial on the merits, is probable, and the balance of equities on this factor weighs in favor of granting some injunctive relief.
B. Likelihood of Success on the Merits
The second factor considered by the Court on Plaintiffs' request for preliminary injunction is whether Plaintiffs have a "likelihood of success on the merits." A consideration of the likelihood of success on the merits is not a determination of the *947 merits. Branstad, 118 F.Supp.2d at 939 (citing Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc., 182 F.3d 598, 603 (8th Cir.1999)). It is only a determination of whether there is a mere "fair chance" for success at trial. Id. However, "where the balance of other factors tips decidedly toward plaintiff, a preliminary injunction may issue if movant has raised questions so serious and difficult to call for more deliberate investigation." Dataphase, 640 F.2d at 113. Some courts have characterized the burden as merely "find[ing] support for [the movant's] position in governing law ..." thereby demonstrating that the movant is likely to succeed. Branstad, 118 F.Supp.2d at 939.
The findings of fact and conclusions of law which lead the Court to its determination of whether there is a likelihood of success on the merits are not binding in the forthcoming trial. University of Texas v. Camenisch, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981); Hubbard Feeds, 182 F.3d at 603. Specific findings serve the purpose of preventing "uncertainty and confusion" in the minds of those persons to whom an injunction is directed. See Calvin Klein Cosmetics Corp. v. Parfums de Coeur, Ltd., 824 F.2d 665, 669 (8th Cir.1987) (noting that Federal Rule of Civil Procedure 65 requires courts to set forth in specific terms the reasons for granting a preliminary injunction).
Plaintiffs bring a § 1983 claim, asserting violations of Fourth, Fifth, Thirteenth, and Fourteenth Amendment rights, including unlawful searches and seizures, unlawful restraints on travel, punishment without due process, and involuntary servitude. In bringing their claim, Plaintiffs assert that Defendants have a persistent custom of removing and discouraging homeless people from remaining in the Downtown area. According to Plaintiffs, this custom is the driving force behind the constitutional violations suffered by Plaintiffs. Under § 1983, local governmental entities may be sued for declaratory and injunctive relief, as well as compensatory damages. Monell v. New York City Dept. of Social Servs., 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Local governments may be sued directly under § 1983 where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." Id. Local governments may also be sued for "constitutional deprivations visited pursuant to governmental `custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." Id. at 690-91, 98 S.Ct. 2018. A "custom or usage" is demonstrated by showing (1) the existence of "a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees"; (2) the governmental entity's "deliberate indifference to or tacit authorization of" the misconduct after receiving notice thereof; and (3) the custom was the "moving force behind the constitutional violation." Kuha v. City of Minnetonka, 365 F.3d 590, 604 (8th Cir.2003). Importantly, municipal liability cannot be based upon a respondeat superior theory. Monell, 436 U.S. at 691, 98 S.Ct. 2018.
Plaintiffs have alleged that the St. Louis Metropolitan Police Department and the City of St. Louis have a persistent policy or custom of removing and discouraging homeless people from remaining in the Downtown area. The evidence currently before the Court demonstrates that Plaintiffs have made a sufficient showing that there is a governmental policy or custom sufficient to subject the city and police defendants to § 1983 liability. Further, Plaintiffs have demonstrated that Defendants did receive notice of this misconduct approximately one year ago. Finally, *948 Plaintiffs provide evidence showing that this custom of removing and discouraging homeless people from remaining in the Downtown area has been the "moving force" behind Plaintiffs' constitutional violations.
Plaintiffs have alleged that numerous constitutional violations have occurred and will continue to occur as a result of the custom and practice of the St. Louis Metropolitan Police Department and the City of St. Louis to remove homeless and homeless-appearing people from Downtown St. Louis and to discourage them from remaining in the area ("the Custom and Practice"). First, Plaintiffs allege violations of their Fourth Amendment rights. The Fourth Amendment protects against unreasonable searches and seizures.[6] It affords protection to all citizens, including those without homes. See Terry v. Ohio, 392 U.S. 1, 8-9, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Plaintiffs allege that they have been subjected to unlawful arrests. Pursuant to the Fourth Amendment, a seizure is unreasonable unless justified by probable cause. In a warrantless arrest, such as the arrests at issue here, probable cause exists only if, at the time of the arrest, "the totality of circumstances demonstrates that the arresting officer personally knows or has been reliably informed of sufficient facts" to cause a reasonable person to believe a crime has been committed and that the person subject to the arrest is the person who committed it. United States v. Reinholz, 245 F.3d 765, 778 (8th Cir.2001).
Plaintiffs allege that they were arrested without probable cause.[7] The Court's findings of fact support these allegations, making it clear to the Court that Plaintiffs are likely to succeed on the merits with regard to their Fourth Amendment unlawful arrest allegations. Plaintiff Chad Johnson was arrested and told to "shut up" when he inquired about the cause for his arrest. He was eventually charged with Drinking in Public, but claims that he was not drinking at the time of his arrest.[8] Sandra Holbrook was arrested and placed in an SUV after police said they would release those arrested if there were no outstanding warrants. She was not released, but was taken to the Justice Center. She was released the next day and was told that she was being charged with Begging. Everett Harris was arrested on July 3, 2004 without being advised of the charges against him. Later, before his release, he was charged with Drinking in Public, but asserts that he was not drinking at the time of his arrest. Harold Jackson was arrested on July 3, 2004 and held at the Justice Center. He was not *949 advised of the charges against him, but was given a summons on July 4, 2004 to appear in court on October 11, 2004. On July 4, 2004, he was again arrested. He was later released and advised he was charged with Begging. Ronnie Trawick and Stacy Smith were both arrested and later advised that they were being charged with Drinking in Public. Both claim that they were not drinking at the time of their arrests.
In addition to affording protection against unlawful arrests, the Fourth Amendment also protects against unreasonable searches and seizures of "papers ... and effects." "A `seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." United States v. Jacobsen, 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984). Plaintiffs allege that their property was unreasonably seized. As is the case with the unlawful arrest allegations, the evidence currently before the Court supports these unreasonable search and seizure allegations as well. Sandra Holbrook lost twenty magazines on the day of her arrest. Stacy Smith's bag of property, including his eyeglasses and radio, were lost when police refused to let him bring his bag with him when he was arrested. When Kenneth Tate was removed from his location in front of the Post Office, Officer Browning took all of the documents from his wallet, including his Medicaid and Medicare cards. When Timothy Swift was arrested, the police dropped his personal belongings on the ground and told him that he did not need them. The evidence presented to the Court at this stage of the proceedings sufficiently demonstrates that Plaintiffs are likely to succeed on this Fourth Amendment claim.
Plaintiffs' second constitutional claim is that the Custom and Practice violates their substantive due process right to travel. The right to travel is a fundamental constitutional right, arising from the Fourteenth Amendment's substantive due process clause, and includes the freedom to move about and loiter for innocent purposes. City of Chicago v. Morales, 527 U.S. 41, 53, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999). Plaintiffs claim that the Custom and Practice prevents Plaintiffs from performing their daily life activities such as eating, sitting, and resting in public places in Downtown St. Louis. The evidence before the Court at this stage of the proceedings indicates that Plaintiffs have demonstrated a likelihood of success on the merits with regard to their right to travel claim. Many of the Plaintiffs have been arrested while eating, sitting, or standing in public places in the Downtown area. One Plaintiff was physically removed from the Downtown area by police and abandoned north of the area. Further, several Plaintiffs claim that they have been told that they are not wanted in certain Downtown areas and that they should stay away.
Plaintiffs' third constitutional claim is that the Custom and Practice violates their substantive due process right to be free of punishment without adjudication of guilt. The state cannot hold and physically punish an individual without a judicial determination of guilt after trial or a plea. Bell v. Wolfish, 441 U.S. 520, 535, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). When the government imposes punishment without first adjudicating guilt, it violates the punished's due process rights. Williams-El v. Johnson, 872 F.2d 224, 229 (8th Cir.1989). Here, Plaintiff Chad Johnson was given the "option" of performing community service, and being released from jail, or remaining in jail until July 6, 2004. He and several other inmates were taken to Lucas Park to pick up trash. Chad Johnson *950 had not appeared before a judge and there had been no adjudication of guilt. Further, it appears from the evidence in this case that this was not an isolated incident or oversight. Several other Plaintiffs testified that, though they did not actually end up performing any community service, it was presented to them as an option and they heard others' names being called to take part. Plaintiffs have demonstrated a likelihood of success on the merits.
Finally, Plaintiffs allege that forcing Plaintiff Chad Johnson and others to perform physical labor under threat of confinement constituted involuntary servitude in violation of the Thirteenth Amendment. Though its principal purpose was to abolish slavery, the prohibition extends to other forms of forced labor. The Supreme Court has defined involuntary servitude as "a condition of servitude in which the victim is forced to work for the defendant by the use or threat of physical restraint or physical injury, or by the use or threat of coercion through law or the legal process." United States v. Kozminski, 487 U.S. 931, 952, 108 S.Ct. 2751, 101 L.Ed.2d 788 (1988). Plaintiff Chad Johnson was compelled by the threat of continued confinement to pick up trash in Lucas Park. Thus, at this point in the proceedings, Plaintiffs have sufficiently demonstrated a likelihood of success on the merits with regard to their Thirteenth Amendment argument.
Various constitutional rights are clearly implicated by the events to which Plaintiffs have testified. The Court concludes that Plaintiffs have sufficiently pointed to governing law in support of their claims and have demonstrated a fair chance of success at trial. Accordingly, Plaintiffs have met their burden of demonstrating a likelihood of success on the merits in their claims against Defendants St. Louis Board of Police Commissioners and City of St. Louis, and in light of the great irreparable harm discussed above, the Court believes this factor weighs in favor of injunctive relief.
C. Balance of Harms
Third, the Court must balance the harm to Plaintiffs if no relief is granted with the potential harm to Defendants if an injunction is issued. See Sanborn Mfg. Co., Inc. v. Campbell Hausfeld/Scott Fetzer Co., 997 F.2d 484, 489-90 (8th Cir.1993) (affirming the district court's determination that the balance of harms weighed in favor of denying injunctive relief). Defendants are bound by federal and state law, including the United States constitution, in executing their duties to protect the safety of St. Louis citizens. Defendants argue that the injunctive relief requested by Plaintiffs will prevent them from executing their duties effectively and efficiently. In the exercise of their duties, police officers must be empowered to act to preserve and protect the interests and lives of the governed. In times of emergencies, for national security, to protect the individual security of individuals under governmental protection, and for many reasons, officers must be allowed, in exercising their lawful authority, to remove people from public areas. Such power does not, however, allow police authorities to antisepticly remove persons lawfully gathered engaging in lawful behavior from public property where the individuals have a lawful right to be. The Court respects the efforts of the police and has no intent to hinder their efforts to conduct lawful arrests and other activity necessary to protect the public welfare. The Court believes that injunctive relief can be narrowly and unambiguously drawn to minimize the harm to Defendants. Thus, the great harm to Plaintiffs far outweighs any harm to Defendants, and the Court therefore *951 concludes that this factor weighs in favors of granting injunctive relief at this time.
D. Public Interest
Fourth, the public interest in this case is of significant import. The nature of the misconduct alleged in this case is alarming. Plaintiffs in this case have alleged unlawful arrests, fabricated charges, lengthy detentions in jail without efforts to obtain a warrant, the use of firecrackers to scare and intimidate, and coercive efforts to force arrestees to perform manual labor. It is not in the public's interest to allow police and other officials to engage in a pattern of constitutional violations. It is in the public interest that police officers make arrests only upon probable cause and that an adjudication of guilt occur prior to any punishment of any arrestee. Defendants suggest that issuing an injunction at this point in the proceedings will actually cause public harm because such an order will erode effective police efforts, causing the public to lose faith in the justice system. As explained above, the Court believes that the necessary order can be narrow enough so that it need not produce the chilling effect of which Defendants complain. Further, given the alarming nature of the misconduct alleged in this case, the Court concludes that an order prohibiting such conduct in the future is necessary to protect the public interest and restore the public's faith in the fair application of law to all citizens. For these reasons, the Court has determined that it is in the public interest for limited injunctive relief to be granted in favor of Plaintiffs.
Accordingly, after careful consideration of the four Dataphase factors, the Court concludes that preliminary injunctive relief is proper in this case.
VI. DEFENSES
In responding to Plaintiffs' allegations of constitutional violations, Defendants raise a number of defenses in addition to the abstention and dismissal arguments already disposed of above: (1) Plaintiffs cannot succeed on the merits of their § 1983 claim because there is no required custom or policy that is "continuous" in nature and Plaintiffs have not demonstrated a causal link between the City, the police, and Captain Warnecke. (2) Any finding by this Court regarding probable cause for Plaintiffs' various arrests would invade the province of the municipal ordinance violation cases. (3) Defendants are protected by sovereign immunity for the allegations of the use of firecrackers and the deprivation of Plaintiffs' property. (4) Defendant City of St. Louis argues that it was acting pursuant to a valid order from a municipal court judge at the time Plaintiff Chad Johnson and others were assigned to community service. Thus, according to Defendant, judicial immunity applies to the actions of the issuing judge and to the City, the entity that enforced the order.[9] Further, Defendant City of St. Louis argues that any constitutional violations that occurred as a result of the order were de minimus. It also argues that there is no risk of future harm because the municipal judge who issued the order has stated that no similar orders will be issued in the future.[10] (5) There is an adequate remedy *952 at law, including replevin and post-trial motions, for a remedy regarding the loss of Plaintiffs' property.[11]
As already explained above, the Court has concluded that, at this time, Plaintiffs have made a sufficient showing that they are likely to succeed on the merits. The Court declines to decide the merit of Defendants' other defenses at this time, but notes that none of the defenses raised by Defendants preclude the entry of an injunction at this stage of the proceedings. Therefore, any immunity or other defenses raised by Defendant will not preclude the injunctive relief which the Court is persuaded is necessary to protect the constitutional rights of Plaintiffs until a trial on the merits is held. Further, the Court does not believe that the exercise of its discretionary, equitable powers in this case will unreasonably invade upon the municipal court proceedings.
VII. BOND
Federal Rule of Civil Procedure 65(c)'s instruction that "[n]o restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper" has long been interpreted to mean that a district court has discretion to grant injunctive relief without requiring bond or other security, especially when doing so would function to bar poor people from obtaining judicial redress. See, e.g., Doctor's Assocs., Inc. v. Stuart, 85 F.3d 975, 985 (2d Cir.1996); Kaepa, Inc. v. Achilles Corp., 76 F.3d 624, 628 (5th Cir.1996); Miller v. Carlson, 768 F.Supp. 1331 (N.D.Cal.1991); Brown v. Artery Org., Inc., 691 F.Supp. 1459, 1462 (D.D.C.1987). In this case, most Plaintiffs are homeless, and all appear to lack sufficient resources from which to provide security. Requiring a bond in this case would effectively function to bar Plaintiffs from obtaining injunctive relief. Therefore, the Court will grant injunctive relief without requiring bond or other security.
VIII. CONCLUSION
As detailed above, the Court believes that, after consideration of the Dataphase factors, injunctive relief is warranted. The Court has concluded that injunctive relief is warranted to prevent future violations of constitutional rights. Framing an enforceable injunction, namely one by which there is a means for determining when it is violated, and framing an injunction that serves the purposes discussed herein, is specifically challenging. Plaintiffs seek numerous forms of injunctive relief. The Court intends to frame the injunctive relief without ambiguity so that Defendants have a full understanding of the limits the injunction imposes and Defendants do not feel hindered in administering their duties.
Plaintiffs have submitted a proposed temporary restraining order that lists eleven activities from which Defendants should be enjoined. Plaintiffs argue that such an order should protect not only the named Plaintiffs in this suit, but also other homeless *953 and homeless-appearing individuals. These activities include making arrests or stops without probable cause or reasonable suspicion; holding such individuals in jail for more time than that needed to obtain a warrant; ordering such individuals to remove themselves from public places; telling such individuals that certain areas are off-limits to them; physically removing, transporting, and then abandoning such individuals; searching without reasonable suspicion, requiring to abandon before arrest, failing to take into police custody, or destroying without reasonable suspicion the possessions of such individuals; interfering with such individuals' rights to exercise the rights incident to any license or permit; and having such individuals perform manual labor before being found guilty of any crime.
The Court has carefully considered Plaintiffs' specific requests for relief. The Court finds the following limited injunctive relief to be appropriate, and believes it will adequately maintain the status quo and prevent irreparable harm until a full trial on the merits is held:
In accordance with this Order and until a full adjudication of Plaintiffs' claims modifies this Order, Defendant St. Louis Board of Police Commissioners, its officers, agents, servants, and employees, and those persons in active concert or participation with them who receive actual notice of this Order are enjoined from directing or allowing the removal of citizens, including homeless and homeless-appearing people, from public areas where such citizens have a lawful right to be without (1) probable cause to believe that a crime has been or is being committed, or (2) a need to clear such public area for reasons of security or public safety.
Further, in accordance with this Order and until a full adjudication of Plaintiffs' claims modifies this Order, Defendant City of St. Louis, its officers, agents, servants, and employees, and those persons in active concert or participation with them who receive actual notice of this Order are enjoined from directing or allowing any judicial imposition of punishment for any municipal ordinance violation before a determination of an accused person's guilt under an ordinance has been made.
The present Order does not in any way address Plaintiffs' § 1983 damage claims, nor does it address Defendants' defenses to those claims. This Order addresses only whether the facts testified to during the two-day hearing on this matter warrants injunctive relief to maintain the status quo until all Plaintiffs' claims can be heard on the merits at a full trial. The Court has considered the options for granting lesser remedies, and in view of the severity of the conduct currently before the Court, and the likelihood of future harm absent judicial intervention, the Court concludes any lesser remedy is not indicated.
Accordingly,
IT IS HEREBY ORDERED that Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction [doc. # 2] is GRANTED, in part. Until a full trial on the merits is held in the above-styled action, Defendant St. Louis Board of Police Commissioners, its officers, agents, servants, and employees, and those persons in active concert or participation with them who receive actual notice of this Order are enjoined from directing or allowing the removal of citizens, including homeless and homeless-appearing people, from public areas where such citizens have a lawful right to be without (1) probable cause to believe that a crime has been or is being committed, or (2) a need to clear *954 such public area for reasons of security or public safety.
IT IS FURTHER ORDERED that until a full trial on the merits is held in the above styled action, Defendant City of St. Louis, its officers, agents, servants, and employees, and those persons in active concert or participation with them who receive actual notice of this Order are enjoined from directing or allowing any judicial imposition of punishment for any municipal ordinance violation before a determination of an accused person's guilt under an ordinance has been made.
IT IS FURTHER ORDERED that, in accordance with the proper exercise of this Court's discretion, no bond or other security shall be required.
NOTES
[1] As Plaintiffs point out, the municipal court could not order the declaratory and injunctive relief Plaintiffs seek in this action since its jurisdiction is limited to the enforcement of municipal ordinances. Further, Defendants St. Louis Board of Police Commissioners and Warnecke are not parties to any of the municipal proceedings.
[2] As Plaintiffs point out, Defendants' request that Defendant Warnecke be dismissed from this action has not been properly presented. According to Civil Procedure Rule 12, "[e]very defense ... shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion: ... (6) failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b). Defendants' request is presented neither in a responsive pleading nor by motion, but is instead presented in a memorandum in opposition.
[3] Because the Court declines to rely on affidavits at this point in the proceedings, Plaintiffs' Motion for Leave to File Additional Affidavits [doc. # 25] will be denied. This denial does not prevent Plaintiffs from offering such evidence in the later portions of these proceedings.
[4] The Court notes that when a violation of constitutionally protected rights is shown, some courts require no further showing of irreparable harm. In such cases, a court may presume irreparable injury exists. See, e.g., Elrod v. Burns, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); Iowa Right to Life Comm., Inc. v. Williams, 187 F.3d 963, 970 (8th Cir.1999) (stating that "loss of First Amendment freedoms, even for minimal period of time, unquestionably constitutes irreparable injury").
[5] Where "there is a persistent pattern of police misconduct, injunctive relief is appropriate" because "[n]o remedy at law would be adequate to provide such protection." Allee v. Medrano, 416 U.S. 802, 815, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974).
[6] Fourth Amendment protections apply to unreasonable searches and seizures by state and local governments through incorporation by the Fourteenth Amendment's Due Process Clause. See Mapp v. Ohio, 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).
[7] In addition to alleging they were arrested without probable cause, Plaintiffs also allege that Defendants violated their Fourth Amendment rights by unreasonably detaining them in jail for 14 to 24 hours without seeking to obtain a warrant and without any intention to do so.
[8] With respect to the arrests of Plaintiffs Johnson, Coleman, and Tate, Defendants argue that each had an active bench warrant when he was arrested, providing probable cause for the arrests. In response, Plaintiffs point out that, at the time Plaintiffs Johnson and Coleman were arrested, a computer check revealed no warrants. (Pl.Ex.Nos. 6, 11). Therefore, the bench warrants could not have been the basis of any probable cause determinations. Plaintiffs further point out that, if an outstanding warrant had been the basis of probable cause for Defendant Tate's arrest, he would have been taken to jail, rather than being transported to an abandoned area along the river front and released there.
[9] With regard to this defense, Plaintiffs point out that "a municipality may not assert the good faith of its officers or agents as a defense to liability under § 1983." Owen v. City of Independence, 445 U.S. 622, 638, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980).
[10] In an affidavit submitted with Defendants' Memorandum in Opposition to Plaintiffs' Motion, Municipal Judge Shelia Walsh attests that neither she nor other judges under her supervision will issue any future orders similar to the order at issue in this case. Plaintiffs argue that a voluntary cessation of illegal conduct is not a ground for denying preliminary relief.
[11] The Court notes that, at this stage of the proceedings, it appears that Plaintiffs are making a Fourth Amendment claim, and not a procedural due process claim with regard to the destruction of their property. Plaintiffs do not appear to dispute that there are remedies at law for the return of any property that was unlawfully retained by the police. Plaintiffs do, however, claim that their possessory interests were the subject of unreasonable interference by the police, in violation of their Fourth Amendment rights. The provision of due process by the government does not necessarily preclude a Fourth Amendment claim. Samuels v. Meriwether, 94 F.3d 1163, 1167 (8th Cir.1996).