**Gary EMINETH, Plaintiff,**

v.

**Alvin JAEGER, Secretary of State of North Dakota, in his official capacity; Wayne Stenehjem, Attorney General of North Dakota, in his official capacity; Richard J. Riha, Burleigh County State's Attorney, in his official capacity, Defendants.**

**Case No. 1:12–cv–139.**

United States District Court, D. North Dakota, Southwestern Division.

Oct. 31, 2012.

---

Monte Lane Rogneby, Vogel Law Firm, Bismarck, ND, for Plaintiff.

## ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

DANIEL L. HOVLAND, District Judge.

Before the Court is a "Motion for Preliminary Injunction" filed by the Plaintiff on October 25, 2012. *See* Docket No. 12. The defendants filed responsive briefs on October 29, 2012. *See* Docket Nos. 13–14. The parties have agreed there is no need for a hearing on the motion and the matter may be decided on the briefs. For the reasons set forth below, the motion is **GRANTED.**

## I. *BACKGROUND*

The plaintiff, Gary Emineth, is a resident of Lincoln, North Dakota. Emineth challenges the constitutionality of Section 16.1–10–06 of the North Dakota Century Code, which provides as follows:

**16.1–10–06. Electioneering on Election Day—Penalty.**

Any person asking, soliciting, or in any manner trying to induce or persuade, any voter on an election day to vote or refrain from voting for any candidate or the candidates or ticket of any political party or organization, or any measure submitted to the people, is guilty of an infraction. The display upon motor vehicles of adhesive signs which are not readily removable and which promote the candidacy of any individual, any political party, or a vote upon any measure, and political advertisements promoting the candidacy of any individual, political party, or a vote upon any measure which are displayed on fixed permanent billboards, may not, however, be deemed a violation of this section.

Emineth seeks to exercise his First Amendment right to engage in political activity on November 6, 2012—Election Day. He contends the North Dakota statute is an unconstitutional abridgment of his First Amendment right to free speech as incorporated against the states by the Fourteenth Amendment. Emineth is currently engaged in constitutionally-protected speech through a display of election yard signs on his private property, and he does not wish to take those signs down on November 6, 2012, as required by North Dakota law. Emineth states that he wishes to speak in support of candidates on Election Day by distributing flyers in public places, which state law prohibits. Emineth states that he frequently discusses the upcoming election with friends, family members, associates, and neighbors, and seeks to continue to do so on Election Day, but state law prohibits such actions. Emineth contends the plain language of Section 16.1–10–06 criminalizes *all speech* aimed at persuading a voter to cast (or not cast) his or her ballot in any particular way on Election Day. He argues that outlawing this conduct before it even takes place imposes a prior restraint on constitutionally-protected speech. Under North Dakota law, if a private individual advocates for or against a candidate, a ballot measure, or any party on an election day—whether to a family member, neighbor, friend, associate, or any other voter—that individual is subject to criminal prosecution. There are few exceptions to criminal prosecution, other than the limited exception for billboards and bumper stickers with particular adhesion qualities. *See* N.D.C.C. § 16.1–10–06.

## II. *LEGAL DISCUSSION*

In determining whether a preliminary injunction should be granted, Rule 65(b) of the Federal Rules of Civil Procedure directs the court to assess whether immediate and irreparable injury, loss, or damage will result to the applicant. The court is required to consider the factors set forth in *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir.1981). Whether a preliminary injunction or temporary restraining order should be granted involves consideration of "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Id.*

It is well-established that the burden of establishing the necessity of a temporary restraining order or a preliminary injunction is on the movant. *Baker Elec. Coop., Inc. v. Chaske*, 28 F.3d 1466, 1472 (8th Cir.1994); *Modern Computer Sys., Inc. v. Modern Banking Sys., Inc.*, 871 F.2d 734, 737 (8th Cir.1989). " 'No single factor in itself is dispositive; in each case all of the factors must be considered to determine whether on balance they weigh towards granting the injunction.' " *Baker Elec. Coop., Inc.*, 28 F.3d at 1472 (quoting *Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc.*, 815 F.2d 500, 503 (8th Cir.1987)).

### A. *IRREPARABLE HARM*

The plaintiff must show there is a threat of irreparable harm if injunctive relief is not granted, and that such harm is not compensable by money damages. *Doe v. LaDue*, 514 F.Supp.2d 1131, 1135 (D.Minn.2007) (citing *Northland Ins. Cos. v. Blaylock*, 115 F.Supp.2d 1108, 1116 (D.Minn.2000)). "The 'mere possibility' that harm may occur before a trial on the merits is not enough." *Johnson v. Bd. of Police Comm'rs*, 351 F.Supp.2d 929, 945 (E.D.Mo.2004). The party that seeks injunctive relief must show that a significant risk of harm exists. *Doe*, 514 F.Supp.2d at 1135 (citing *Johnson*, 351 F.Supp.2d at

945). The absence of such a showing is sufficient grounds to deny injunctive relief. *Id.* (citing *Gelco Corp. v. Coniston Partners,* 811 F.2d 414, 420 (8th Cir.1987)).

 It is axiomatic to say that the "protection [of political speech] lies at the heart of the First Amendment." *Nixon v. Shrink Mo. Gov't PAC,* 528 U.S. 377, 400, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000) (Breyer, J., concurring). The United States Supreme Court has recognized that the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). In this case, North Dakota's enforcement of the electioneering ban will prevent Emineth from expressing his support for candidates in the overall context of the 2012 election cycle; specifically, on Election Day. Elections are, by nature, time sensitive and finite. While there will be other elections, no future election will be *this* election. Emineth is desirous of voicing his support for the specific candidates running for election on November 6, 2012. If he is forbidden from doing so, no court can offer the equitable relief of going back to November 6, 2012, once that day has passed. Thus, the harm Emineth suffers will arguably be irreparable.

The Eighth Circuit Court of Appeals said that, "[i]f [plaintiff] can establish a sufficient likelihood of success on the merits of [his] First Amendment claim, [he] will also have established irreparable harm." *See Phelps–Roper v. Nixon,* 545 F.3d 685, 690 (8th Cir.2008), overruled on other grounds by *Phelps–Roper v. City of Manchester, Mo.,* 697 F.3d 678 (8th Cir.

2012). The Court finds this *Dataphase* factor weighs in favor of granting a preliminary injunction.

## B. *BALANCE OF HARM.*

 In the context of injunctions, the Eighth Circuit has noted that "[t]he balance of equities ... favors the constitutionally-protected freedom of expression." *Phelps–Roper v. Nixon,* 545 F.3d at 690. This case hinges upon the First Amendment freedom of speech on a crucial day— Election Day 2012. At issue is a unique and broad provision of state election law enacted in 1981, which prohibits electioneering on an election day. The State indicates that a similar prohibition has existed in North Dakota statutory law since at least 1911. *See* 1911 N.D. Sess. Laws, ch. 129 § 16. The purpose of the original law was to "Secure the Purity of Elections ...". *Id.*[1] A cursory review of the statute raises serious questions as to its constitutionality and its justification in modern day society. Thousands of voters in Burleigh County, and throughout the State of North Dakota, have already cast their ballot at the polls—all while being constantly bombarded by political ads designed to "induce or persuade" them to vote a certain way in this election. While the public interest in upholding Emineth's free speech rights is great, no party has an interest in the enforcement of an unconstitutional law. The Court finds this *Dataphase* factor weighs in favor of the issuance of a preliminary injunction.

## C. *PUBLIC INTEREST.*

 The First Amendment is the foundation to our political process. Thus,

---

**1.** Few would agree that political campaigns in modern times are pure. Most people today would acknowledge that with the advent of Super PACs, elections have become events where billions of dollars are spent bludgeoning political candidates, parties, and the fed-

eral government. Common in elections across America today are divisive, negative, and vitriolic political campaigns which, in the eyes of most voters, has reached a new level of dysfunction. The long-term ramifications of this relentless negativity is yet to be seen.

vindication of the rights it guarantees would rarely serve the public more than on an election day. In the context of an injunction, "the determination of where the public interest lies also is dependent on the determination of the likelihood of success on the merits of the First Amendment challenge because it is always in the public interest to protect constitutional rights." *Phelps–Roper,* 545 F.3d at 690; see *Child Evangelism Fellowship of Minn. v. Minneapolis Special Sch. Dist. No. 1,* 690 F.3d 996, 1004 (8th Cir.2012) (noting that a likely First Amendment violation favors the issuance of an injunction). It is undisputed that the "public interest favors protecting core First Amendment freedoms." *See Iowa Right to Life Comm., Inc. v. Williams,* 187 F.3d 963, 970 (8th Cir.1999). Thus, the Court finds this *Dataphase* factor also weighs in favor of the issuance of a preliminary injunction.

### D. *PROBABILITY OF SUCCESS ON THE MERITS.*

██ The electioneering ban in North Dakota was enacted in 1981, and expressly prohibits "[a]ny person asking, soliciting, or in any manner trying to induce or persuade, any voter on an election day to vote or refrain from voting for any candidate or the candidates or ticket of any political party or organization, or any measure submitted to the people." It is clear that, on its face, the statute imposes a prior restraint on protected speech. As a prior restraint, the law is subject to "strict scrutiny"—a test it appears to fail because it is not narrowly tailored to a compelling government interest.

██ A prior restraint is generally any governmental action that would prevent a communication from reaching the public. Specifically, it is a statutory, administrative, judicial, or other prohibition that forecloses speech before it takes place. For decades, the United States Supreme Court has condemned prior restraints. Indeed, "[a]ny system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity." *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 70, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963) (internal citations omitted).

The North Dakota electioneering ban outlaws speech about candidates, parties, and ballot measures on any election day. Rather than punishing speech that interferes with the fair and orderly administration of elections where such speech takes place, the law was issued in advance of the time the forbidden communications are to occur. The electioneering ban broadly prohibits speech both on its face and by inducing excessive caution on the part of the speaker.

The Supreme Court has invalidated statutes as prior restraints when they impose upon speakers "an uphill burden to prove their conduct lawful." *Illinois ex rel. Madigan v. Telemarketing Assocs.,* 538 U.S. 600, 620, 123 S.Ct. 1829, 155 L.Ed.2d 793 (2003). The Court certainly recognizes that some speech can be harmful, such as voter harassment and intimidation. However, North Dakota's prior restraint on *all* speech lacks the required "nexus" to these undesired outcomes.

██ It is clear and undisputed that prior restraints on speech are subject to strict judicial scrutiny. The United States Supreme Court has held that a prior restraint is justified "only where the evil that would result from the [speech] is both great and certain and cannot be mitigated by less intrusive measures." *CBS, Inc. v. Davis,* 510 U.S. 1315, 1317, 114 S.Ct. 912, 127 L.Ed.2d 358 (1994). In addition to being a prior restraint, the North Dakota electioneering law is a content-based restriction on speech, since it singles out election-related expression for prohibition.

This is particularly troublesome because "debate on the qualifications of candidates [is] integral to the operation of the system of government established by our Constitution." *Buckley v. Valeo*, 424 U.S. 1, 14, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (holding that spending money to speak about elections is constitutionally-protected speech). The Supreme Court has recognized that "government entities are strictly limited in their ability to regulate private speech in such 'traditional public fora.'" *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 469, 129 S.Ct. 1125, 172 L.Ed.2d 853 (2009) (internal citation omitted). "Reasonable time, place, and manner restrictions are allowed," but content-based restrictions must satisfy strict scrutiny; i.e., they must be "narrowly tailored to serve a compelling government interest." *Id.*

In order to satisfy strict scrutiny, laws "must be narrowly tailored to serve a compelling government interest." *Id.* The State of North Dakota has failed to articulate a compelling government interest that the challenged law furthers. One can hardly conceive of a statute less narrowly tailored than a blanket prohibition on *all* election-related speech. Such a broad restriction on constitutional rights has rarely, if ever, been found to be constitutional, regardless of the context. *See Bd. of Airport Comm'rs of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 577, 107 S.Ct. 2568, 96 L.Ed.2d 500 (1987) (finding regulation prohibiting "all 'First Amendment activities'" at an airport *substantially* overbroad); *Edenfield v. Fane*, 507 U.S. 761, 777, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993) (holding that "[e]ven under the First Amendment's somewhat more forgiving standards for restrictions on commercial speech, a State may not curb protected expression without advancing a substantial governmental interest").

The only ascertainable state interest in enacting and enforcing North Dakota's electioneering law was articulated in a case which construed it more than twenty years ago. In *District One Republican Committee v. District One Democrat Committee*, 466 N.W.2d 820, 832 (N.D.1991), the plaintiffs argued that the court should read and expand Section 16.1–10–06 to prohibit distribution of election-related flyers the night before the election in order to "prevent last minute election tactics ... and promote an election system where each candidate is fairly and equitably allowed time to respond to issues and statements raised by the opposition." *Id.* While the plaintiffs did not persuade the court to extend the law's speech prohibition to apply the evening before an election, their argument provides some insight into the law's legislative intent and purpose.

The State of North Dakota may have wanted to ensure that if someone made a false accusation about a candidate (or a ballot measure or a party), that candidate would have adequate time to refute the allegation before voters cast their ballots. If this was the intention, the Legislature presumably concluded that allowing virtually any election-related speech on an election day would foreclose the opportunity for a timely response, undermining the election's integrity if such last-minute allegations proved influential but false.

The United States Supreme Court expressly rejected this "confusive tactics" rationale in *Mills v. Alabama*, 384 U.S. 214, 220, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966), noting that

> "[t]his argument, even if it were relevant to the constitutionality of the law, has a fatal flaw. The state statute leaves people free to hurl their campaign charges up to the last minute of the day before election. The law ... then goes on to make it a crime to answer those 'last-

minute' charges on election day, the only time they can be effectively answered. Because the law prevents any adequate reply to these charges, it is wholly ineffective in protecting the electorate 'from confusive last-minute charges and countercharges.' "

*Id.* The Supreme Court went on to conclude that "no test of reasonableness" could save that "law from invalidation as a violation of the First Amendment." *Id.* North Dakota's electioneering law suffers from this same fatal flaw.

The United States Supreme Court has recognized one state interest as sufficiently compelling to justify prohibitions on speech: preserving the right of individuals to vote freely, effectively, and in secret by "regulat[ing] conduct in and around the polls in order to maintain peace, order and decorum there." *Burson v. Freeman,* 504 U.S. 191, 193, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992). However, the State of North Dakota does not assert in this case that the electioneering ban furthers such an interest.

In the context of restricting speech, the United States Supreme Court found the requisite narrow tailoring in *Burson v. Freeman,* based on the state's compelling interest in "regulat[ing] conduct in and around the polls in order to maintain peace, order and decorum there." *Id.* The Supreme Court in *Burson* held that Tennessee's statutory "campaign free zones," which prohibited vote solicitation within 100 feet of the polls, constituted "the rare case in which we have held that a law survives strict scrutiny." *Id.* at 211, 112 S.Ct. 1846. Consistent with this ruling, several states have campaign or electioneering-free zones within a limited geographical radius of polling places. The Supreme Court in *Burson* was careful to note that "[a]t some measurable distance from the polls, of course, governmental regulation of vote solicitation could effec-

tively become an impermissible burden." *Id.* at 210–11, 112 S.Ct. 1846.

The Court finds that North Dakota's electioneering law is overly broad and is not limited to conduct in and around the polls. Instead, the law extends to "[a]ny person asking, soliciting, or in any manner trying to induce or persuade, any voter on an election day to vote or refrain from voting for any candidate or the candidates or ticket of any political party or organization, or any measure submitted to the people." N.D.C.C. § 16.1–10–06. Many states regulate conduct at or near the polls, and this appears sufficient to preserve the right of individuals to vote freely, effectively, and in secret. However, North Dakota's virtually unlimited ban on "electioneering" and election-related speech goes far beyond these less intrusive measures, and is far from being narrowly tailored in order to withstand a constitutional challenge.

The controlling case in this dispute is *Mills v. Alabama,* 384 U.S. 214, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966). In *Mills,* the United States Supreme Court invalidated a state law which made it illegal for a newspaper editor "to do no more than urge people to vote one way or another in a publicly held election" on Election Day. *Id.* at 220, 86 S.Ct. 1434. In *Mills,* the Supreme Court addressed the constitutionality of an Alabama law which outlawed the publication of election-related newspaper editorials on Election Day. In striking down the statute, the Supreme Court stated the following:

Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs. This of course includes discussions of candidates, structures and forms of government, the manner in which government is operated

or should be operated, and all such matters relating to political processes.

\* \* \*

Admitting that the state law restricted a newspaper editor's freedom to publish editorials on election day, the Alabama Supreme Court nevertheless sustained the constitutionality of the law on the ground that the restrictions on the press were only 'reasonable restrictions' or at least 'within the field of reasonableness.' The court reached this conclusion because it thought the law imposed only a minor limitation on the press-restricting it only on election days-and because the court thought the law served a good purpose. It said:

> "It is a salutary legislative enactment that protects the public from confusive last-minute charges and countercharges and the distribution of propaganda in an effort to influence voters on an election day; when as a practical matter, because of lack of time, such matters cannot be answered or their truth determined until after the election is over." 278 Ala. 188, 195–196, 176 So.2d 884, 890 [ (1965) ].

This argument, even if it were relevant to the constitutionality of the law, has a fatal flaw. The state statute leaves people free to hurl their campaign charges up to the last minute of the day before election. The law held valid by the Alabama Supreme Court then goes on to make it a crime to answer those 'last-minute' charges on election day, the only time they can be effectively answered. Because the law prevents any adequate reply to these charges, it is wholly ineffective in protecting the electorate 'from confusive last-minute charges and countercharges.' We hold that no test of reasonableness can save a state law from invalidation as a violation of the First Amendment when that law makes it a crime for a newspaper editor to do

no more than urge people to vote one way or another in a publicly held election.

*Id.* at 218–20, 86 S.Ct. 1434.

The State of North Dakota's electioneering ban is a far more sweeping prohibition on speech than the law invalidated by the United States Supreme Court in *Mills* back in 1966. While Alabama limited just one form of speech (newspaper editorials on election day), North Dakota prohibits all conceivable means of attempted or actual persuasion or speech, except for billboards and certain bumper stickers. Since Alabama's prohibition on editorials did not survive constitutional scrutiny, North Dakota's far broader ban on electioneering activities cannot survive the more intense "strict scrutiny" required in this challenge. The electioneering ban flies in the face of general constitutional principles the Supreme Court has articulated in the context of both the free speech and free press clauses for decades. There is simply no reading of the statute that is consistent with the United States Constitution. The Court finds this *Dataphase* factor weighs strongly in favor of the issuance of a preliminary injunction.

### III. CONCLUSION

After a careful review of the entire record, and an analysis of the *Dataphase* factors, the Court finds the plaintiff has met his burden under Rule 65 for the issuance of a preliminary injunction. The North Dakota electioneering ban enacted in 1981 is an unreasonable restraint on constitutionally-protected speech. It is clearly an invalid law based on United States Supreme Court precedent (*Mills v. Alabama* ) from 1966. There is no valid justification for the law in modern day society, nor any compelling state interest offered to support its continued existence. As a practical matter, tens of thousands of

individuals in Burleigh County, and throughout the State of North Dakota, have already cast their vote in this election by absentee ballot or early voting—all while being bombarded nearly every waking moment by vitriolic political ads designed to "induce or persuade" them to vote or refrain from voting for a particular candidate or political party. Decades from now we will likely learn from the "experts" that such electioneering overkill has been hazardous to the health and well-being of us all. The broad electioneering ban in North Dakota—which is designed to prohibit any "electioneering" activity on the day of an election—cannot withstand a constitutional challenge. The demise of this archaic law enacted in 1911, to "secure the purity of elections," has long been recognized as inevitable.

The Court **GRANTS** the plaintiff's motion for a preliminary injunction (Docket No. 12) and **ORDERS:**

(1) That the defendants or anyone acting on their behalf, shall be restrained and enjoined during the pendency of this action from prosecuting any person for a violation of Section 16.1–10–06 of the North Dakota Century Code.

(2) No bond shall be required to be posted by the plaintiff before the preliminary injunction is effective. *See* Rule 65(c).

(3) The plaintiff shall arrange for the immediate service of this order on the defendants.

(4) The parties shall inform the Court within the next thirty (30) days whether there is a need to schedule a trial on the merits.

**IT IS SO ORDERED.**